Good morning. Good morning, and may it please the Court. Lauren Weinstein for the petitioner. I'd like to reserve three minutes for rebuttal. Very well. Keep your eye on the clock, but we'll try to help. Yes, Judge. Ms. Angarita was denied asylum and withholding of removal because the immigration judge found that she'd committed a particularly serious crime after a fundamentally unfair hearing. I'd like to start with the due process issue. Under this Court's precedence, due process requires an immigration judge to instruct a pro se petitioner regarding what she must prove to establish her eligibility for relief. That did not happen here. The IJ never explained what a particularly serious crime was, how he would determine whether the offense was a particularly serious crime, and he never explained that the finding could be dispositive of Ms. Angarita's application. And what authority do you rely upon for what you've just said? Those are this Court's Jacinto and Agamen decisions. And you believe that those cases say what you said? Yes, Your Honor. Both cases say that the immigration judge must explain to a pro se petitioner what he must prove to establish his eligibility for relief. That's the Agamen decision, 296 F. 3rd, 871 at 877, and it quotes Jacinto, 208 F. 3rd at 728. On this particular case with the specifics of a particularly serious crime, you're suggesting that the IJ has an obligation to give, if you will, a law school lecture to an unlearned pro se person and explain to, in this case, her exactly what needs to be proved. Is that what you're saying? No, Your Honor. I don't think it needs to be a law school lecture. It just needs to explain that there is a particularly serious crime bar, what that bar is, and what factors are relevant. The BIA's Frentis Q decision lays out those factors, and the immigration judge's decision in this case explains it rather succinctly. That decision was issued the day after the asylum hearing in this case, and that explanation of what the particularly serious crime bar would have been sufficient on the burden of proof explanation under Agamemnon and Jacinto. But isn't the substance of the proceeding what we should look at and not whether the immigration judge delivered a jury instruction? You know, what's important is the facts that led to the determination or not of seriousness, and was it your client given the opportunity to present all the testimony and all the evidence that she had that would support the position that she was taken? And even if she wasn't given the, you know, the elements, aren't the facts ultimately what matters here? The facts are what matters, but when Ms. Zangarita testified about the circumstances of the DUI offense here, she had no idea why she was being asked about it. She didn't know that there was a particularly serious crime bar, and thus she failed to amplify and explain clearly testimony that was essential to that determination. Well, let's just say that he had done what you request. Ultimately, it gets down to the facts of what happened, right? Yes, Your Honor. As to whether or not it was a particularly serious crime. All of what happened was explored. She had an opportunity to talk about it, to give her understanding of it, and the other side of the government had an opportunity to explain what happened to the victim here, the serious injuries involved and so on. All that occurred, did it not? She did have an opportunity to testify, but that testimony wasn't informed as to why she was being asked about these questions. Let's just say that she had been informed in some way that would satisfy your belief as to what was required. What would have changed? I think the hearing would have proceeded very differently from the way that it actually proceeded. The only evidence regarding the offense other than Ms. Zangarita's testimony was the arrest report, and had she known the significance of rebutting the allegations of the arrest report, she would have done so more clearly. She would have more clearly— Excuse me. Forgive me, counsel. How do you bar and explain the fact that the driver that she hit suffered a fractured pelvis, a lacerated spleen, a lacerated liver, and a fractured neck? How do you explain that? You just say, well, it really wasn't fractured. It only had a little whatever here, and the liver was fine because the person was a drinker before. What would she do? I mean, I don't understand how—however it had been explained to her, it would have made any difference at all in terms of what she would have said to refute the central issue here, which is whether this was a particularly serious crime. I think she could have testified about what she observed about the other person involved in the accident. She said that she saw the other person talking on a cell phone. It would have been relevant to know if that person was walking around and okay or debilitated because of the injuries. Forgive me. How does that address whether the person had suffered a lacerated liver or a lacerated spleen? A lot of people talk on cell phones just before they expire after they've been hit, right? You're in shock. So how does that help? I think it would have helped the immigration judge evaluate the seriousness of the injuries to know what the other person's demeanor was. I think that she could have also testified about other facts that were significant. The injuries that the other person suffered was just part of the analysis that the immigration judge engaged in. She could have also testified more clearly about her driving, which the IJ found to be erratic and dangerous. She could have also testified more clearly about any struggle with the officers, which was a significant factor in the immigration judge's analysis. And, of course, under Frentiscue, the sentence imposed is a significant component of the analysis, and she could have provided documents regarding why she only received the lowest term of years of that sentence. And, of course, it's not just relevant to the particularly serious crime determination. The immigration judge also didn't instruct Ms. Angrita on what she had to prove under the Convention Against Torture, that it's more likely than not that she'd be tortured by government officials if she were returned to Colombia. What is the best support for that proposition? She's been in this country for 26 years. You know, why would she be singled out or targeted if she returned? You know, would any transgender person be similarly situated, or is there something about her circumstances in particular that matter for our analysis? Yes, her sexual abuse as a child distinguishes her situation, and also something that she didn't get to testify about because she didn't realize its significance because there was no instruction on a burden of proof, which is that she was raped by police officers when she was at a boycott. Is that on the record? That's at page 55 of the administrative record, Your Honor. And that surely would have... What page? I'm sorry, Judge. What page? 55. 55, yes. Judge Ferris has it. That surely would have influenced the immigration judge's decision on the likelihood of future torture by Colombian government officials if she were returned. And it went to the heart of Ms. Angrita's CAT claim. But apart from the failure to instruct on burden of proof, the immigration judge also erred by denying relief based on the allegations of the arrest report, which directly contradicted Ms. Angrita's testimony on key points, testimony that the immigration judge found credible. After observing Ms. Angrita and considering the evidence, the immigration judge found Ms. Angrita to be a credible witness. The government never contested and still doesn't contest that credibility finding. What specifically was at variance? I looked at the record. I saw what she said. I saw what the government added. I didn't find them to be conflicting. In what way was it conflicting? The arrest report said that the police needed to use a taser on Ms. Angrita. Well, listen to what she said. She said that when the police approached, she, in quotes, opened the door and asked him to leave, then, in quotes, closed the door and held herself to the steering wheel. Yes. She also testified. She's saying, go away, leave me alone, I'm here. They say, please get out of the car. She won't get out of the car. She was resisting arrest, right? No, Your Honor. She testified that she didn't struggle, and the immigration judge either overlooked. I thought she testified that she closed the door and clung to the steering wheel. She testified at page 231 of the record that she, quote, didn't struggle. And I think the reference to go-go was actually talking to her dog, who was in the car with her, and she wanted the dog to run off. Was the name of the dog go-go? I don't know. It's not in the record, Your Honor. No, she's telling the dog to go-go. That's what she's saying. Exactly. That could lead to many things. It's one of the things that we could get into on a hearing on remand, Your Honor. The other inconsistency is about her driving. The arrest report said it was dangerous and erratic, but Ms. Angarita testified that she was driving behind the other cars at the same speed as the other cars. It wasn't dangerous. She wasn't speeding, as the arrest report concluded. It's pretty hard, though, to argue that it wasn't dangerous because of what happened. That was a collision. The collision, ultimately, yes, was dangerous. But her driving before that is the dispute, and I think that's what the immigration judge is referring to, and that's what the arrest report refers to when it says that she was speeding down the highway and city streets. But Ms. Angarita contradicted that allegation just as she contradicted the allegation about struggling with the officers, and the immigration judge either overlooked that testimony or disregarded it entirely. Or had a different interpretation of what actually happened. That wouldn't be permissible under this Court's precedence. Having found her to be a credible witness, he was bound to accept her testimony as truth. He can accept the words. He can accept the words. In other words, she said, I was sitting in the car holding the steering wheel. She had been told to exit. She didn't exit. That's what I mean by interpretation. She thinks she was doing everything just fine, but the police, observing the same conduct, uncontradicted, would reach a different conclusion. That's what I'm asking you. And isn't the conclusion that was reached reasonable on this record? No. The conclusion wasn't reasonable. The immigration judge, having found her credible, needed to accept her allegations as true, needed to accept her account. I'm suggesting that he did, that he or she did, but reached a different conclusion to your client. I don't think the immigration judge was within his authority to reach a different conclusion when that conclusion was in direct contradiction with her credible testimony. Suppose, and just quickly, if we were talking, I would ask you a question, but instead of letting me ask it, you would continue to talk. Now, that hasn't happened, and you didn't do it, but I'm suggesting that you might say, all I was doing was trying to make my point, and I would think she's not listening to the question. Do you see what I mean when I said different conclusion on the same conduct? I think this record reflects that your client reached a certain conclusion and the administrative law judge reached a different one, but neither disputed the conduct. The conduct was the same. I follow, Your Honor, but I do think it's a dispute about facts, not about the ultimate conclusion that follows from those facts. The police officer said that she struggled with them. My client said, no, I didn't struggle. The police officers in the arrest report, of course, there's no live testimony before the immigration judge from anybody other than Ms. Ungarita. They said she drove radically and she was speeding. She said, no, I didn't speed. That's a factual dispute, not a dispute about conclusions. Counsel, you said you wanted to save, I think, three minutes. You want to do that? Yes, exactly right. Thank you, Your Honor. Okay, very good. Let's hear from the government. Good morning, Your Honors, and may it please the Court. Derek Julius on behalf of Respondent of the United States Attorney General. Respondent respectfully asks that the Court deny this petition for two primary reasons. First, the agency acted within its discretion in finding Ungarita's conviction for evading police and causing serious bodily injury to constitute a particularly serious crime. After considering the underlying circumstances, the nature of the offense, and the three-year sentence imposed, the agency reasonably concluded that Ungarita was a danger to the community. Second, the immigration judge provided Ungarita a full and fair hearing by giving Ungarita a reasonable opportunity to present all claims through repeated open-ended questions to get at the bases for Ungarita's Convention Against Torture Protection claim, which at that point was presented by all objective evidence as that of a gay man fearing torture in Colombia, not as a transgender woman, a claim first raised to the Board of Immigration Appeals. This Court reviews the particularly serious crime determination under an abusive discretion standard, and as this Court recently determined in Avendano-Hernandez, the Court's review is limited to ensuring that the agency relied on the appropriate factors and the proper serious crime conclusion. That's exactly what happened here. When we look at what the agency looked at, we looked at the Francesco factors, the circumstances underlying the offense, namely that Ungarita was high on methamphetamine and PCP while fleeing police for at least 30 to 45 minutes on the streets of Pasadena. The nature of the offense, under California Vehicle Code, Ungarita had to willfully flee police and proximately cause the bodily injury of a person here, lacerating organs and damaging and fracturing bones. The sentence imposed, also here, three years, the agency considered that that was at the low end of the sentencing that could have been imposed for this infraction, leading them to the conclusion that this is a serious offense. Finally, when we look at what the agency itself looks to in determining whether something is particularly serious, the agency looks to physical harm to the persons. Contrary to opposing counsel's characterization, relying on a consenting opinion in the Delgado decision that the court should be looking to intentional harm or intentional action, that is not a requirement that this court, in any majority opinion, has required, nor the agency. Here as well, the agency considered proper evidence. In addition to the arguments raised in our brief, I would point out that there is a jurisdictional problem with Ungarita's reliance on any perceived discrepancies between the police reports and the testimony. This was never an argument raised by counsel to the Board of Immigration Appeals, therefore it's unexhausted and the court generally lacks jurisdiction to consider it. To the extent they look at that evidence, as your honors have pointed out, there is really no discrepancy between the police report facts and the testimony provided by Ungarita. Therefore, this doesn't fall within the footnote of Alphonsus, and there's certainly no indication that the agency took the police reports over the credible testimony of Ungarita. Essentially, we know what happened underlying this decision, the facts at issue. The agency considered the factors, considered the evidence properly, and therefore reasonably concluded that this was a particularly serious crime. Excuse me, counsel, which of the claims do you say was unexhausted? The claim that the agency erred in crediting the arrest report over the credible testimony. There's no allegation that there was any mis-weighing of evidence before the board, so that essentially has been unexhausted. Turning to the due process claim, the immigration judge certainly gave Ungarita a reasonable opportunity to present the claims as set forth in the application and in response to the questions during testimony. Ungarita checked on the application. Gender male explained that past harm and future harm was feared on account of being gay and account of sexual orientation. There was never any mention of a transgender identity or anything involving that. So to require the immigration judge to essentially read Ungarita's mind and know that that was the true nature of the claim, as opposed to a sexual orientation or gay-based claim, is simply unreasonable. The immigration judge asked repeated, open-ended questions. Who do you fear will torture you? Why do you fear they will torture you? Ungarita responded that Ungarita feared torture by narco-traffickers, guerrillas, and an ex-boyfriend. Basically, fearing essentially political affiliations of her family, things that Ungarita had witnessed by these guerrillas and narco-traffickers. And in response to fear of the boyfriend, there was fear that the boyfriend would beat Ungarita if Ungarita ever revealed that the ex-boyfriend was gay or was also engaged in drug dealing, neither of which Ungarita intended to disclose. So based on that evidence, the immigration judge determined that Ungarita failed to meet the burden of showing it was more likely than not Ungarita would be tortured or with the acquiescence of a Colombian government official. Essentially, what Ungarita wanted was a line-by-line, sentence-by-sentence, word-by-word questioning on the application of what Ungarita meant by certain phrases, and explained in an affidavit to the Board of Immigration Appeals, had Ungarita specifically been asked, what did you mean by you were threatened by Colombian police on account of your sexual orientation? Ungarita's explanation was, by threatened, I would have said I meant raped, and on account of sexual orientation, I would have said what I meant was gender identity. Those are two very different statements, two very different claims, and ultimately could have been the basis for an adverse credibility decision. And so for Ungarita to complain that the immigration judge somehow overlooked or ignored a transgender claim below is simply contradicted by the record. What was before the immigration judge was a torture claim by, essentially, a gay man. The claim was expounded upon at the Board of Immigration Appeals level, first in a pro se brief by Ungarita, who essentially had the ability to articulate a transgender claim, just never raised it to the immigration judge. And in that context, it was construed as a motion to remand. The agency acted within its discretion in finding that that evidence had been previously available and properly denied it. So unless your honors have any further questions, I will rest on the briefs. I ask that you please deny the petition. I don't think we have any more questions. Thank you. Rebuttal. Thank you, Your Honor. Just briefly, I'd like to point out the failure to instruct on burden of proof is distinct from the arguments that the government focuses most of its argument time on. The failure to fully and fairly develop the record is a separate due process violation, which I'm happy to discuss if this Court is interested. Isn't that your client's burden? To fairly and fully develop? Your client's burden to develop the record, to present the evidence, whatever the claim may be. For example, on the transgender claim, do you dispute the fact that that was never raised as a transgender claim before the IJ? I don't dispute that, Your Honor, but it's not my client's burden. It's the immigration judge's burden to fairly and fully develop the record for the benefit of the pro se petitioner. She's claiming that the basis of her claim is that she is transgender. She doesn't say she is. She doesn't imply that she is, and yet she bases her claim on something not put in evidence. How can that be the fault of the IJ? The IJ has an obligation to ask about the contents of the application under this Court's decision in Ashodi. Oh, wait a minute. That case does not say you have to go line by line and say, you said on line 2X, what did you mean by that? You don't have to do that. It's the petitioner's burden to establish by evidence the case that the petitioner wishes to make. The IJ has an opportunity to ask questions, but doesn't have to ask any particular questions if the evidence is already there based upon what your client says. Isn't that correct? That's correct, Your Honor, but the IJ has two important obligations that are at issue in this case. One is to instruct on the burden of proof so that the petitioner knows what's important, and that's clear in this Court's Jacinto and Agamemnon decisions. That didn't happen here, and the government never claims that it does. The only instructions on evidentiary burdens or anything that my client had to prove is at 201 and 202 of the record, and that just says that she has the right to present testimony, the right to appeal, and the right to counsel, and the right to examine the government's testimony evidence. The second portion, which is a distinct procedural failure in this case, is the failure to fully and fairly develop the record. Either of those failings requires a remand for a new hearing. Essentially, the government faults my client for not getting the full story out there, but under this Court's precedence, it's not the pro se petitioner's obligation to do that when she has no idea what she has to prove because she's never instructed. It's the immigration judge's burden. That's a remarkable position. That would overturn about 95 percent of the cases that we hear. I don't think so, Your Honor. What you seem to be saying is that the government has to present and argue your client's case for you and that the government has to put everything in it it can to dispute its own version of the case. How can that be? No, Your Honor. That's not what I'm saying. What I'm saying is that the immigration judge has to explain the burden of proof, and that can be done succinctly. Okay. Well, say that's done. Yes. I mean, the reality is I don't see how that makes any difference in this case. For example, on the transgender issue, as you confessed, there is no evidence put in the record by your client about that issue. Nothing. And yet that's the basis of the claim. How can that possibly meet any standard where the petitioner has the burden to show what the claim is all about? She said that had she been asked about the statement in her asylum application that she's gay and that she was threatened by police officers because she's gay, that she would have testified about being transgender and that she was raped by the police. Well, that's why I say if that's what the law requires, then any case that we get where there is a failure of proof, then all the petitioner has to say is, well, you know, the government didn't fill out my case for me. The government didn't argue my case for me. So let's send it back and let the government see what evidence it can come up with for me to satisfy my case. That's not the law. You're right, Your Honor. And I think that's why it's important to recognize that there are two separate issues here. One is about the burden of proof and everything she could have put in on particularly serious crime to dissuade the judge that she wasn't ineligible for most of the relief that she sought. And separately, the failure to fully and fairly develop the record. If this Court doesn't have any further questions, I'd ask you to remand to the agency. Thank you. I thank both counsel. We appreciate your argument. The case just argued is submitted.
judges: Tymkovich, Farris, M. Smith